UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GEORGE G. BURGER,

        Plaintiff,           Case No. 2:12-cv-257

v.                               Honorable R. Allan Edgar

JEFFREY STIEVE,

        Defendants.
_____/

## OPINION

        This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*, and Plaintiff has paid the initial partial filing fee. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, Plaintiff's action will be dismissed for failure to state a claim.

**Factual Allegations**

Plaintiff George G. Burger, an inmate at the Chippewa Correctional Facility (URF), filed this civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Chief Medical Officer Jeffrey Stieve, Medical Director Jesus Nuri[1], Registered Nurse Rae Ann Brand, and Registered Nurse Michael G. Brown. In his complaint, Plaintiff alleges that prior to his incarceration in 2003, he sustained a broken left patella femoral joint in a car accident. As a result, Plaintiff had surgery during which a rod was inserted into Plaintiff's leg and through his knee. In addition, part of Plaintiff's patella was removed. Also prior to Plaintiff's incarceration, he suffered from kidney failure and received a life saving kidney transplant. Doctors on Plaintiff's transplant team warned him that he should never use medications such as Motrin and Ibuprofen, because they could cause his kidneys to fail.

In 2007, Plaintiff twisted his left knee and was eventually seen by a doctor for this injury on October 19, 2007. Plaintiff was prescribed Ultram for pain. On November 1, 2007, x-rays showed arthritic changes which involved Plaintiff's patella / knee. On September 17, 2007, Doctor Brendan Sherry conducted a pain assessment and physical examination on Plaintiff and requested that Plaintiff be permanently prescribed Ultram. On September 22, 2008, Plaintiff began receiving Ultram 100 mg, three times a day. On August 6, 2009, a second radiology test was performed, which showed that Plaintiff suffered from arthritis in his knee with sclerosis, cystic lesions, and small bone spurs in the posterior patella.

On May 7, 2011, Defendant Brown began to crush Plaintiff's Ultram into powder and mix them with water in order to prevent Plaintiff from "cheeking" his medication. Plaintiff asserts

---

[1]This party is referred to as Jesus Neri in the body of Plaintiff's complaint.

that the more rapid absorption of the medication affected his nervous system and caused him to faint on September 12, 2011, and November 3, 2011. The second time Plaintiff fainted, he hit his head and sustained a "gash," which required stitches. On December 11, 2011, Defendant Brand submitted a reevaluation request to the Pain Management Committee, indicating that Plaintiff had been caught "cheeking" and recommending that Plaintiff's Ultram dosage be decreased to 50 mg either two or three times a day. The request noted that Plaintiff was able to perform all ADLs (activities of daily living) and noted that Plaintiff was unable to take NSAIDs (nonsteroidal anti-inflammatory drugs) because of his kidney transplant. (Plaintiff's Exhibit F, docket #1-1, p. 11 of 12.) On December 31, 2011, Defendant Brand informed Plaintiff that she had to re-apply to the Pain Management Committee for Ultram, but failed to tell Plaintiff that she had recommended the dosage be decreased.

On January 25, 2012, Defendant Neri interviewed Plaintiff and gave him a document signed by Defendant Stieve and ordering that Plaintiff could receive Tylenol up to 2 times a day, and that he should practice self-massage, and use heat, range of motion and stretching exercises. The document also stated that Plaintiff's Ultram, Vitamin D3, Tums, Urea, and Multivitamins be stopped. (Plaintiff's Exhibit G, docket #1-1, p. 12 of 12.) When Plaintiff asked why the Ultram was being stopped, Defendant Neri stated that he had no idea. Plaintiff asserts that within 24 hours, he began to experience nausea, vomiting, diarrhea, shaking, tremors, anxiety, rigors, insomnia, and sweating as a result of the withdrawal from Ultram.

On January 29, 2012, Plaintiff filed a grievance against Defendants Stieve and Neri for stopping his Ultram. The step I response dated February 6, 2012, states:

> Investigation of the patient's complaint and the patient's electronic medical record indicates the patient was ordered Ultram to expire January 29, 2012. The patient had a crush order due to diversion of

> the medication. The Medical Practitioner submitted the request for the renewal of the medication prior to its expiration. The Pain Management Committee recommendations of January 18, 2012, indicated Tylenol, stop Ultram, stop Vit D, self massage and heat. Alternative pain medications are ordered and current. The patient will continue to be followed by the on site Practitioner and Pain Management Committee.

(Plaintiff's Exhibit J, docket #1-2, p. 5 of 9.)

Plaintiff filed a step II appeal, which was responded to on March 12, 2012. In the step II response, Registered Nurse Patricia Lamb stated:

> Grievant claims that Health Services is in violation of PD 03.03.130 because grievant's Ultram, a "medically necessary medication for pain," was stopped "for no medical reason." Grievant wants to know why his "chronic medications," were stopped and why he did not receive a physical exam prior to "renewing or discontinuing these medications." Grievant also wants to [know] why his "complaint of the failed AV fistula has been overlooked." Grievant wants to be reimbursed $.75 for health records that he has requested to "find the reason I was denied by PMF." Finally, grievant wants to know why he has not received "Heat Rom and instructed stretching exercises as ordered by M.D. Stieve."
>
> Review of the electronic record confirms the Step I response.
>
> Grievant is advised that prescription criteria can and do change over time. The discontinuation of grievant's Ultram was done upon the recommendation of the Pain Management Committee (PMC). This Committee is comprised of several physicians, including both Regional Medical Officers and the Central Medical Officer. These physicians have access to the grievant's medical record and render informed decisions regarding those patient's referred to them. It was the determination of the physicians who comprise the PMC that grievant's pain could be controlled with interventions other than Ultram.
>
> Grievant's Ultram expired on 1/29/12. Grievant was examined by a provider, Dr. Neri, on 1/25/12, prior to the expiration date, and was informed of the PMC recommendations at that time.

> Regarding the AV fistula, it is noted that a consult request for surgical excision/repair of the fistula was denied in May, 2011. This decision was discussed with the grievant on 5/13/11. Recently, grievant's concerns re: fistula were noted by the physician at a visit on 2/21/12. Further follow up is planned at an appointment in early May.
>
> Fees for medical records issued to grievant at grievant's request are not refundable.
>
> Regarding PMC recommendations of self massage, heat, range of motion, and stretching exercises, grievant is encouraged to discuss these issues at his next provider appointment. This should occur in the near future as grievant was referred back to the provider at a nursing appointment which occurred today. Health Services will be notified to add these issues to that appointment.
>
> Grievant is advised that no policy violation is found regarding the above matters.
>
> Grievant is encouraged to submit a CHJ-549 Health Care Request for evaluation should any adverse symptoms persist or worsen.

(Plaintiff's Exhibit L, docket #1-2, p. 7 of 9.) Plaintiff's step III appeal was also denied.

On January 30, 2012, Defendant Brown responded to a health care request by scheduling Plaintiff to be seen by the nurse on February 20, 2012. On February 1, 2012, Dr. Michael Henderson performed a radiology exam on Plaintiff's left knee which showed that Plaintiff had mild soft tissue swelling and advanced arthritic changes in his knee. On February 3, 2012, Plaintiff filed a grievance on Defendants Neri and Stieve indicating that he was suffering from withdrawal sickness due to the abrupt discontinuation of his Ultram, and on Defendant Brown for failing to physically examine him on January 30, 2012. The step I response, dated February 6, 2012, noted that alternative medications (Tylenol) had been ordered and that Plaintiff would continue to be followed by the on site Practitioner and the Pain Management Committee. (Plaintiff's Exhibit R, docket #1-3, p. 5 of 13.) The step II response by Registered Nurse Lamb stated:

> Grievant is requesting a nursing investigation into the medical decision to crush his Ultram and then to discontinue that same medication. Grievant quotes a variety of PDR guidelines re: Ultram ER and claims that these were disregarded in his case. Grievant wants to know why his dose was not tapered off and why Nurse Brown did not evaluate grievant re: urgent complaint on 1/29/12.
>
> Note that the issue of discontinuation of Ultram has already been addressed in response to grievance URF-1201-0409-12F3. The grievant is referred to that response as it will not be duplicated here.
>
> Regarding grievance's multiple PDR references to Ultram ER, grievant is advised that he was never prescribed this extended release (ER) form of Ultram. The regular Ultram that was prescribed to grievant was safe to crush and is, in fact, commonly administered in that form. Had a taper been deemed medically necessary, it would have been recommended by the physicians on the Pain Management Committee and /or the on-site providers. In any case, grievant is advised that the PDR is a reference tool. It is not intended to substitute for the discernment and clinical judgment of a qualified physician. It is well within the scope of practice of the PMC physicians and on-site providers to determine the appropriate plan of care re: grievant's medication.
>
> Regarding issues pertaining [to] lack of evaluation for an urgent complaint, it is noted that a health care request, initiated by the grievant on 1/29/12, was received in Health Services on 1/30/12. This request lists a complaint of "continued pain with no Ultram orders." No other acute complaints are listed. The issue was referred to the provider for further action. On 1/31/12, the provider reviewed the complaint and did not deem any acute intervention necessary at that time. The request appears to have been triaged appropriately by Nurse Brown.

(Plaintiff's Exhibit T, docket #1-3, p. 8 of 13.)

On March 8, 2012, Plaintiff submitted a health care request indicating that he was having severe pain in his knee. On March 9, 2012, the response indicated that an appointment had been scheduled. On March 31, 2012, Plaintiff submitted a health care request stating that the Acetaminophen 325 mg he was taking was not relieving his knee pain, which was intolerable.

Plaintiff requested to be seen by an orthopedic surgeon. On April 29, 2012, Plaintiff mailed a letter to Defendant Stieve, asserting that he suffered from chronic knee pain and that he had suffered withdrawal symptoms as a result of the sudden discontinuation of his Ultram. Plaintiff stated that his knee was deteriorating and that Tylenol did not alleviate his pain. Plaintiff did not receive a response to his letter. Plaintiff states that his pain is now so debilitating that he is not able to conduct basic activities of daily living.

Plaintiff claims that Defendants' conduct violated his Eighth Amendment rights and seeks compensatory and punitive damages, as well as injunctive relief.

## Discussion

### I. Failure to state a claim

A complaint may be dismissed for failure to state a claim if "'it fails to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting

*Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the

inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004). If, however the need involves "minor maladies or non-obvious complaints of a serious need for medical care," *Blackmore*, 390 F.3d at 898, the inmate must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle*, 429 U.S. at 105-06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). It is clear from Plaintiff's complaint, as well as from his exhibits, that Plaintiff's condition was being monitored and assessed by multiple medical providers. Where, as here, "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Perez v. Oakland County*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's action will be dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the Court dismisses the action, the Court discerns no good-faith basis for an appeal. Should Plaintiff appeal this decision, the Court will assess the $455.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $455.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A Judgment consistent with this Opinion will be entered.


Dated:       12/4/2012                    */s/ R. Allan Edgar*
                                          R. Allan Edgar
                                          United States District Judge